1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF MAINE

3    _____

4    UNITED STATES OF AMERICA,         CRIMINAL ACTION

5            Plaintiff         Docket No:  2:19-122-JDL-2
                                           2:21-163-JDL

6       -versus-

7    BERNARD GADSON,

8            Defendant

9    _____

10             Transcript of Proceedings

11

12    Pursuant to notice, the above-entitled matter came on for
**Sentencing** held before **THE HONORABLE JON D. LEVY,** United
States District Court Judge, in the United States District
Court, Edward T. Gignoux Courthouse, 156 Federal Street,
Portland, Maine, on the 26th day of May 2022 at 10:22 a.m. as
follows:

16    Appearances:

17    For the Government:   Sheila W. Sawyer, Esquire
                             Assistant United States Attorney

18    For the Defendant:  Luke S. Rioux, Esquire

19    Also Present:  Heather Belanger, U.S. Probation

20

21               Lori D. Dunbar, RMR, CRR
               Official Court Reporter

22         (Prepared from manual stenography and
           computer aided transcription)

23

24

25

```
 1                    (Open court.  Defendant present.)

 2              THE COURT:  Good morning.  We are convening a

 3     sentencing hearing in the matter of United States versus

 4     Bernard Gadson, Docket 19-CR-122 and 21-CR-163.  Counsel, will

 5     you please enter your appearances for the record?

 6              MS. SAWYER:  Good morning, Your Honor, Sheila Sawyer

 7     for the United States.

 8              THE COURT:  Good morning.

 9              MR. RIOUX:  Your Honor, Luke Rioux for Mr. Gadson.

10              THE COURT:  Thank you, good morning.  The record

11     will reflect that Probation Officer Heather Belanger is with

12     us as well and of course Mr. Gadson is present.

13          Attorney Sawyer, has the Government provided notice to

14     any victims of the offense entitled to notice under federal

15     law?

16              MS. SAWYER:  It has, Your Honor.

17              THE COURT:  Thank you.

18          Mr. Gadson, if you'd stand, please.  This is your

19     sentencing hearing, and so the overall purpose of today's

20     hearing is for me to sentence you based upon your guilty pleas

21     and convictions.  I'm going to hear from the attorneys this

22     morning, I'll hear from you as well if you wish to speak,

23     although you're not required to, and I'll hear from anyone

24     else that's presented to speak today.

25          I'm going to begin by asking you and Attorney Rioux a
```

1    series of questions.  The purpose of my questions are, first,

2    I want to make sure that you've read and understand and

3    discussed with your lawyer the revised presentence report that

4    was prepared by Ms. Belanger, the probation officer in this

5    case.  Secondly, I want to be sure there's nothing that

6    interferes with your ability to understand what is taking

7    place today during the sentencing.  And then, third, overall I

8    want to make sure that you understand the sentence that I

9    decide to impose and the reasons for it.

10          Now, if you don't understand a question that I ask you,

11    don't try to answer it; just tell me you don't understand and

12    I'll rephrase.  Do you understand?

13              THE DEFENDANT:  Yes, Your Honor.

14              THE COURT:  And if you wish to speak with Mr. Rioux

15    before responding to a question, tell me that and I'll make

16    arrangements for that to happen.  Do you understand that as

17    well?

18              THE DEFENDANT:  Yes, Your Honor.

19              THE COURT:  Mr. Gadson, are you currently taking any

20    medications?

21              THE DEFENDANT:  I'm not.

22              THE COURT:  Have you had any other types of drugs or

23    alcohol in the past 24 hours?

24              THE DEFENDANT:  No, Your Honor.

25              THE COURT:  Are you thinking clearly this morning?

```
 1                    THE DEFENDANT:  Yes.
 2                    THE COURT:  Is there anything at all that could
 3         interfere with your ability to understand what's taking place
 4         today?
 5                    THE DEFENDANT:  No.
 6                    THE COURT:  Do you authorize Attorney Rioux to act
 7         and speak on your behalf today?
 8                    THE DEFENDANT:  I do.
 9                    THE COURT:  Attorney Rioux, I take it that you have
10         met with your client and discussed with him the revised
11         presentence report in this case?
12                    MR. RIOUX:  I have, yes, Your Honor.
13                    THE COURT:  You had sufficient time for that?
14                    MR. RIOUX:  Yes.
15                    THE COURT:  Are you satisfied that he understands
16         it?
17                    MR. RIOUX:  I am.
18                    THE COURT:  Mr. Gadson, is that correct, you've read
19         the report?
20                    THE DEFENDANT:  Yes, I have.
21                    THE COURT:  You've had sufficient time to discuss it
22         with your lawyer?
23                    THE DEFENDANT:  Yes, I have.
24                    THE COURT:  And do you feel that you understand it?
25                    THE DEFENDANT:  Yes, I do.
```

```
 1              THE COURT:  Now, Attorney Rioux, you recently
 2    provided the Court a restatement of the objections that your
 3    client has to the revised presentence report.  This is ECF
 4    No. 212.  It lists 11 specific areas of objection.  And am I
 5    correct in understanding that this is -- that these are,
 6    rather, in fact the objections that you and Mr. Gadson have --
 7    or Mr. Gadson has, rather, to the information contained in the
 8    report?
 9              MR. RIOUX:  Yes, Your Honor, that is correct.
10              THE COURT:  All right, thank you.  You can be
11    seated.
12         We, I think this is apparent, have a number of issues to
13    work through this morning before we get to the actual --
14    consideration of the actual sentence in this case, so let's
15    turn to first the loss amount.  Now, in this case the -- it
16    appears to me that there's agreement between the Government
17    and the defendant on a number of adjustments regarding the
18    loss amount.  The first is that the intended loss for
19    December.
20    26, 2018, at the UMass FCU should be $9,500, not $19,000, but
21    that the actual loss -- restitution loss in that row is
22    correct at $9,500.  Let me pause there.  Both sides in
23    agreement that that adjustment needs to be made?
24              MS. SAWYER:  Yes, Your Honor.
25              MR. RIOUX:  Yes, thank you, Your Honor.
```

1          THE COURT:  Secondly, the January 2nd, 2019,

2    transaction for $8,000 at the Granite State FCU in New

3    Hampshire should be deleted, which is the first row on Page 9

4    of the report.  Is that also, Attorney Sawyer, the

5    Government's position?

6          MS. SAWYER:  Yes, Your Honor.

7          THE COURT:  And Attorney Rioux?

8          MR. RIOUX:  We agree.

9          THE COURT:  These deletions would cause an intended

10   loss of $258,267 in the total line just above Paragraph 17 and

11   the restitution loss figure is not impacted.  Let me continue.

12          In addition, as your sentencing memos reflect, it seems

13   to me there's agreement to remove the loss associated with Kay

14   Jewelers and Best Buy located on the first row and the

15   second-to-last row of the first financial chart after

16   Paragraph 16.  So those will be removed.  The total intended

17   loss in the financial chart would thus be $249,557.  That is

18   taking into account all the changes that we've discussed up to

19   this point.  So the total loss in the financial chart is

20   $249,557.

21          Attorney Sawyer, is the Government in agreement?

22          MS. SAWYER:  Yes, Your Honor, that seems right.

23          THE COURT:  Attorney Rioux?

24          MR. RIOUX:  Yes, based on those changes I agree.

25          THE COURT:  Okay.  These changes do not alter the

1    loss enhancement in Paragraph 30.  Attorney Sawyer, is the

2    Government in agreement with what I just said?

3            MS. SAWYER:  Yes, Your Honor, because the -- when

4    you consider the loss associated with the fraudulent loans in

5    Minnesota and add that amount to the 249,000 you remain well

6    above the 250,000 threshold.

7            THE COURT:  Correct.  Attorney Rioux?

8            MR. RIOUX:  I agree that, provided that additional

9    allegation is part of the relevant conduct, it would not

10   change the Paragraph 30 adjustment.

11           THE COURT:  Okay.  And so for purposes of the

12   specific offense characteristics, it's that 12 levels have

13   been added, and I want both sides to be clear with me whether

14   there's any dispute about that.  Attorney Sawyer?

15           MS. SAWYER:  None, Your Honor.

16           THE COURT:  Attorney Rioux?

17           MR. RIOUX:  Based on those alterations there's no

18   dispute about that.  Of course, we've objected to other

19   conduct.

20           THE COURT:  We're going to talk about other conduct,

21   but I'm specifically asking about Line 30, the 12-point

22   enhancement.

23           MR. RIOUX:  Yes, we're in agreement, thank you.

24           THE COURT:  Thank you.  Okay.  All right, it appears

25   that I've come into -- oh, here it is, looking for this piece

1    of paper which I just found.

2        I now want to turn to the question of the defendant's

3    objections otherwise, and these pertain to his role and the

4    role enhancement that he should receive under the sentencing

5    guidelines.  In Mr. Gadson's sentencing memorandum, and I'm

6    specifically referring to Pages 4 to 5 at this point, he -- he

7    argues that he's only liable for the intended loss amount,

8    which we've now just adjusted, but he's only liable for that

9    amount as adjusted if he was in charge of the operation and

10   responsible for the actions of Benson and Novikov, the two

11   individuals who were directly involved in the bulk of the

12   fraud attempts.  And as I understand the argument is that this

13   is not shown, that he was in charge, because it's not been

14   shown that Mr. Gadson is the person known as Gio.  And so the

15   argument as I understand it, Attorney Rioux, your argument is

16   that if Gio is not Mr. Gadson then there -- the conclusions

17   are wrong and that this is at the heart of your objections, at

18   the center of your objection, to many of the -- much of the

19   information contained in the report that relates to his role

20   and the proper level of role enhancement under the sentencing

21   commission guidelines.

22        Have I just accurately stated what your position is?

23            MR. RIOUX:  Yes, Your Honor, thank you.

24            THE COURT:  All right.  So before I hear from the

25   Government, which has the burden of production on this issue,

1    I want to be clear about what the issue is.  As I understand

2    the issue, it is if I find that the Government fails to

3    establish that Mr. Gadson is Gio, then the report's

4    conclusions regarding Mr. Gadson's role are incorrect or

5    unproven; and on the other hand, if I find that the Government

6    establishes that Mr. Gadson is Gio then the report's

7    conclusions regarding Mr. Gadson's role are correct.  Is that

8    a fair distillation of what's in dispute here, Attorney

9    Sawyer?

10           MS. SAWYER:  That's how I interpreted the

11   defendant's position.

12           THE COURT:  All right.  Attorney Rioux, is that a

13   fair distillation of your position?

14           MR. RIOUX:  Yes, I think that's generally correct,

15   Your Honor, thank you.

16           THE COURT:  Okay.  In addition, a threshold question

17   under the guidelines, specifically Section 6A1.3(a), is

18   whether a sentencing factor here, Mr. Gadson's role, is,

19   quote, reasonably in dispute.  And the Government has cited to

20   United States versus Cirilo, 2015 First Circuit decision, for

21   the following proposition:  Where a defendant's objections to

22   a presentence investigation report are wholly conclusory and

23   unsupported by countervailing evidence, the sentencing court

24   is entitled to rely on the facts set forth in the presentence

25   investigation report.

1        Now, let me first ask, starting with you, Attorney

2    Sawyer, you cited the case so I assume you agree that that's a

3    correct statement of the current law?

4        MS. SAWYER:  Indeed, Your Honor.

5        THE COURT:  And, Attorney Rioux, is that a correct

6    statement of the current law?

7        MR. RIOUX:  Yes, Your Honor, I believe that's an

8    accurate statement from that case.

9        THE COURT:  Okay.  And so, Attorney Rioux, the next

10   question to you is do you have countervailing evidence that

11   you intend to present in support of your assertion that Mr.

12   Gadson is not Gio?

13       MR. RIOUX:  Your Honor, aside from challenging the

14   evidence that the Government has presented by way of argument

15   and perhaps under proffer today, that would be our

16   presentation.

17       THE COURT:  Well, I want to pin you down on this,

18   because I don't want to conduct a hearing that's not needed.

19   Do you have, for purposes of the excerpt I just read from

20   Cirilo, some type of countervailing evidence that puts into

21   question, then, the facts set forth in the presentence

22   investigation report?

23       MR. RIOUX:  Well, Your Honor, I presented -- I have

24   an exhibit that I presented to the Court today regarding the

25   address in Dorchester.  I don't have any other witness to call

1   per se, and I don't have any other -- other evidence to

2   present besides argument, proffer, and what's been presented

3   in the memos.

4         THE COURT:  And so the exhibits you're referring to

5   have been marked, as I understand, Defendant's Exhibits 1

6   through 6, I believe it is?

7         MR. RIOUX:  Yes, Your Honor.

8         THE COURT:  And so this is the -- this will be the

9   countervailing evidence?

10        MR. RIOUX:  Well, particularly, Your Honor, I've

11  presented Exhibits 3 and 4.  There was an assertion from

12  Ms. Novikov that she had visited Gio's home, which was a

13  mansion in Dorchester or Mattapan, and the only Dorchester

14  location that Mr. Gadson had been associated with was this

15  Elba Terrace location, which I have presented some

16  documentation of here to support the assertion that this is

17  not a mansion in Dorchester or Mattapan.

18        THE COURT:  Very good.  All right, thank you.

19        Attorney Sawyer, you have also presented to the Court in

20  advance two marked exhibits, Government's 1 and 2.  And will

21  this be the Government's evidence today on this point?

22        MS. SAWYER:  Yes, Your Honor.  I had prepared

23  additional exhibits implicating Gadson in the fraud scheme.  I

24  do not believe it's necessary to go beyond what we've already

25  presented, particularly in light of the admissions that the

1      defendant himself made at his own plea hearing --

2              THE COURT:  Okay.

3              MS. SAWYER:  -- with respect to his role in the

4      offense.

5              THE COURT:  All right.  And so, since all the

6      evidence is documentary evidence, it seems to me that it's

7      appropriate, counsel, for you to go ahead and argue your

8      positions.  You can refer to the exhibits.  Further -- of

9      course, I've read your memos, but I'm interested to hear from

10     you this morning in terms of any additional argument you might

11     make in connection with these exhibits on the disputed point,

12     which is whether or not there's sufficient proof for me to

13     conclude that Mr. Gadson is Gio as concluded in the

14     presentence investigation report.  Attorney Sawyer?

15             MS. SAWYER:  Certainly, Your Honor.  As I argued in

16     the sentencing memorandum, I think the evidence is clear that

17     the defendant is the person Roza Novikov characterized as the,

18     quote, essential mastermind of this scheme.  And I think that

19     the information that Ms. Novikov provided is reliable and

20     corroborated by a number of other pieces of evidence, critical

21     pieces of evidence.

22         First, as I noted in my sentencing memorandum, the

23     defendant is charged in the -- in this case with conspiring

24     with Rahshjeem Benson, his cousin, to commit bank fraud.

25     Mr. Benson pled guilty in this courthouse and acknowledged the

1    defendant's role as his co-conspirator.  He did not dispute

2    any of the information set forth in the prosecution version.

3    He admitted that it was all true to the best of his knowledge.

4        Fast forward to the defendant's own Rule 11 hearing, in

5    the prosecution version that the Government --

6            THE COURT:  Attorney Sawyer, if I could interrupt

7    here.  I understand that argument but I also understand that

8    I'm likely going to hear from Attorney Rioux that, although

9    Mr. Gadson admitted his role and acknowledged the facts set

10   forth in the prosecution version, he -- he defines -- he

11   defines the scope of the conspiracy quite differently or his

12   involvement, rather, as only related to three of the bank

13   frauds and not -- not the rest of the activity.  So what is it

14   about the Benson -- what is it about the Benson guilty plea

15   and Mr. Gadson's own guilty pleas and acknowledgments of the

16   prosecution versions which supports the conclusion of whether

17   or not he is Gio?

18           MS. SAWYER:  Well, first, Your Honor, if you look at

19   the defendant's sentencing memorandum, Page 4, there are only

20   three transactions that he has claimed to have, quote, some

21   level of involvement in.  He's even cagey about what that

22   involvement is, but these are the three transactions he's

23   owned up to.

24       The first is a transaction involving Roza Novikov in

25   Maine in January of 2019.  That is one of the transactions in

1    which the defendant was caught texting her a copy of a lease

2    agreement, a pay stub, really caught dead in the water on that

3    one, so he's admitted to that one.

4        These other two transactions, Your Honor, are in March

5    of 2019 in New Bedford, Massachusetts, and are transactions in

6    which the defendant himself applied for loans in the name of

7    an individual named Joshua McDermott.  This -- these

8    transactions are relevant conduct, but they are not the core

9    of the conspiracy between Benson, Novikov, and Gadson.  In

10   fact, Novikov and Benson had already been arrested in Kittery

11   in connection with the Maine attempts.

12       So in his plea agreement and in the pros version, when

13   the defendant agrees that he engaged in a scheme to defraud

14   banks and credit unions throughout New England and the various

15   roles that he played in doing so, and acknowledged in the pros

16   version that Novikov told Agent Pawson she had applied for

17   several loans throughout New England over the course of

18   several weeks and that when they were successful she received

19   a portion of the proceeds, plural, and provided the rest to

20   Benson, who in turn provided a share to Gadson.  Scheme,

21   loans, throughout New England.

22       Your Honor, I think that goes beyond the one Kittery

23   transaction that he's willing to accept responsibility for,

24   and it corroborates the information and is consistent with the

25   information that Ms. Novikov provided when she was arrested.

 1    She did not know the defendant's real name.  She knew him by

 2    nicknames, but she also provided enough information for the

 3    case agent to figure out that BG3 or Gio was in fact Bernard

 4    Gadson.  She said they were cousins; in fact, they're cousins.

 5    She said he resided in Dorchester, Massachusetts.  What did

 6    the defendant do in his sentencing memo?  He lied and said he

 7    never lived in Dorchester, Massachusetts.  Now he's taking

 8    issue with her characterization of the residence and

 9    conveniently omitting the fact that he told Your Honor he had

10    never resided in Dorchester.  I think that misrepresentation

11    in and of itself is probative, is probative evidence that

12    corroborates again the fact that he is who we say he is.

13         She also said that Benson and BG had been arrested

14    together in Massachusetts and served time together.  We know

15    from the presentence report and their criminal records that in

16    fact that was true.  In fact, it was that piece of

17    information, the fact that they had been arrested and served

18    time together, that enabled Agent Pawson to figure out that

19    Bernard Gadson was BG and to eventually show Ms. Novikov a

20    photograph of the defendant, which she acknowledged was Gio.

21         So I think when you step back and you look at how the

22    investigation unfolded and you look at how reliable the

23    information that she provided was and you consider the fact

24    that it's consistent with what the defendant himself

25    acknowledged at his own plea hearing, I think it's clear he's

1    Gio.

2        And as the Government said in its brief, there is zero

3    evidence implicating Mr. Williams in the case.  He was just

4    tagging along for the ride when he came up to Maine.  He was a

5    friend of Mr. Benson's.  And the defendant has offered no

6    evidence to the contrary on that point.

7        So when you step back and look at the way the case

8    evolved and you look at the information she provided and you

9    look how consistent it is with the prosecution version he

10    acknowledged and the other evidence that is in the case, I

11    think it's clear, he is Gio.

12        THE COURT:  All right.  And so that the record is

13    clear on this point, the actual evidence that you're referring

14    to in making these factual assertions are Government's 1 and

15    2, along with the prosecution version documents filed in --

16    with the court in connection with Mr. Gadson and the two other

17    co-conspirators, Benson and Novikov, and I believe you've also

18    referenced Mr. Gadson's plea agreement.  Is that a fair and

19    accurate identification of the actual evidence that you're

20    referring to?

21        MS. SAWYER:  Yes, Your Honor, with one exception or

22    one addition.  Ms. Novikov also told Agent Pawson that the

23    defendant owned a number of luxury vehicles that he rented out

24    to, you know, to just generate cash.  That is a really unique,

25    discrete fact I think that also establishes he's Gio, and that

1   is corroborated by the presentence report itself, which notes

2   his ownership of luxury vehicles and which notes the fact that

3   he rented them out from time to time.  I -- I think the fact

4   that she knew that about the defendant and it's confirmed in

5   the presentence report is another piece of evidence that's

6   very, very compelling.

7          THE COURT:  Thank you.  Attorney Rioux?

8          MR. RIOUX:  Thank you, Your Honor.  Your Honor, in

9   the prosecution versions at issue here -- and I apologize if

10  I'm hard to hear -- Mr. Gadson did of course admit to the

11  prosecution version and did not contest the information there.

12  This document was the product of some negotiation or

13  discussion to settle on the terms.

14          Now, certainly we could not -- we could not and did not

15  intend to dispute the assertions of what Ms. Novikov said

16  during an interview.  She clearly made various statements

17  during an interview to Agent Pawson.  And -- and we

18  acknowledge that there were transactions throughout the New

19  England area involving Ms. Novikov and Mr. Benson.

20          THE COURT:  Does that jibe with what I understand

21  your position is today, which is that he was only involved in

22  three?

23          MR. RIOUX:  He was involved in a limited number of

24  transactions while Benson and Novikov were engaged in a

25  broader -- a broader conspiracy to do other bank fraud

1    transactions.

2          THE COURT:  So those other transactions are not part

3    of the conspiracy to which your client has pled guilty?

4          MR. RIOUX:  Well, Your Honor, he has pled guilty

5    to -- to the bank fraud allegation and to the aiding and

6    abetting identity theft, and he -- he acknowledges that he did

7    overlap with their conspiracy to some limited degree.  The

8    question is whether the entirety of the transactions those two

9    engaged in are attributable to Mr. Gadson as relevant conduct,

10   and we submit that they are not.

11    Ms. Novikov made assertions here that she had, as we

12   discussed, been to Gio's home, which she described as a

13   mansion in Dorchester or Mattapan, and the -- explained that

14   she knew him to own a Rolls Royce and I believe a Porsche.

15   There is some reference in the presentence report that there

16   was -- Mr. Gadson told the investigator that he at one time

17   did have a Porsche SUV, and so I agree that that is there.

18   But there's no connection to a Rolls Royce or similar vehicle

19   like that.

20    Ms. Novikov admitted that she was -- her interaction was

21   with Mr. Benson.  She was recruited by him, encountered by him

22   initially.  He worked with her on a daily basis, came up with

23   locations to run schemes, to go in and do transactions.  It is

24   notable that the individual she claims to be running the

25   operation is Gio, and at the transaction in January at Key

1    Bank there is present there Giovanni Williams.  He is present

2    throughout the early investigation and is a suspect that Agent

3    Pawson names throughout his reports.  Additionally he shows up

4    on surveillance footage, as Ms. Sawyer points out, along for

5    the ride.  He appears to be along for the ride throughout this

6    time period, perhaps just as a passenger, but I submit to the

7    Court that that is not terribly believable, that Giovanni

8    Williams, who is present for these transactions, is

9    definitively not the Gio that is referenced by Ms. Novikov.

10   In fact, we submit that he is the Gio referenced by Ms.

11   Novikov.  And while Mr. Gadson did have some involvement, he

12   became a convenient scapegoat to blame for this transaction or

13   to protect Gio, who is the actual leader of the conspiracy.

14            THE COURT:  So is that your -- is that your theory

15   as to what -- or belief as to why she would lie and that is

16   she's protecting somebody?

17            MR. RIOUX:  Yes, Your Honor.

18            THE COURT:  Okay.

19            (Defendant conferred with counsel.)

20            MR. RIOUX:  And additionally, of course, she is

21   cooperating and giving information to protect herself because

22   she received a substantial benefit for her cooperation, which

23   is certainly fair and reasonable.  But by implicating Mr.

24   Gadson, who Mr. Pawson comes to believe is a leader of the

25   conspiracy, she helps to reenforce the Government's theory of

```
 1   the case and she protects Giovanni, who is an obvious

 2   alternative for the Gio nickname.

 3           THE COURT:  Is there any evidence before me to

 4   suggest that -- I've forgotten his last name -- Giovanni

 5   Williams, is it?

 6           MR. RIOUX:  Yes, Your Honor.

 7           THE COURT:  Is there any evidence that relates to

 8   Mr. Williams' actions suggesting criminal conduct on his part?

 9           MS. SAWYER:  No, Your Honor, and I do want to

10   clarify one thing.  In the Homeland Security reports that

11   Agent Pawson authored, there's an introductory paragraph that

12   characterizes Giovanni as an accomplice, and that just sort of

13   carries forward through all the reports.  That information is

14   based solely on the fact that Mr. Williams was arrested by

15   Kittery police on the same day that Novikov was and that

16   Benson was.  There was zero evidence to -- to suggest that he

17   was involved in any other way.  So that line in the report I'm

18   proffering to the Court is based solely on the fact that he

19   happened to be arrested at the same time.

20           THE COURT:  Thank you.  Yes.

21           MR. RIOUX:  There is zero evidence except for his

22   physical presence at the location of the bank fraud, his

23   association with Novikov and with Mr. Benson, and the fact

24   that his first name is Giovanni and the alleged leader of the

25   conspiracy is a man referred to as Gio.  So if we discount all
```

1     of those things there is no evidence.  But if we consider

2     those items there certainly is evidence.

3              THE COURT:  All right, thank you.

4              MS. SAWYER:  One more point I wanted to make, Your

5     Honor.  When Ms. Novikov was arrested by Kittery -- the

6     Kittery Police Department in January, she cooperated

7     immediately.  The federal government was not even involved.

8     She spoke to Detective Cummer first and when Detective Cummer

9     heard what she had to say he called Agent Pawson and said,

10    hey, this might be something that you want to look at.  But at

11    the time that she implicated the defendant and spilled her

12    guts there was no offer on the table from my office or any

13    prosecuting office that she would receive any credit

14    whatsoever for -- for testifying or for telling truthfully

15    what she understood.

16             THE COURT:  Am I correct that in her proffer, which

17    is then reflected in the report that I have, she identifies

18    Gio as having -- the same person as having a second nickname?

19             MS. SAWYER:  Yes.

20             THE COURT:  And that is what?

21             MS. SAWYER:  BG, B as in boy, G as in girl, B as in

22    Bernard, G as in Gadson, correct.

23             THE COURT:  All right.  Thank you.  Any other

24    evidence or argument from either side on these points?

25             MS. SAWYER:  Your Honor, I am loathe to go down this

1    path, but I did mark a handful of exhibits that further link

2    the defendant to the conspiracy that Ms. Novikov and Mr.

3    Benson were involved in.  They -- I can proffer to the Court

4    what they consist of.  I can tell the Court that when Roza

5    Novikov applied for loans in Massachusetts and in Maine she

6    used a cell phone number, (508) 245-1943.  We obtained PayPal

7    records for the defendant Mr. Gadson's PayPal account, and

8    that number is listed in the PayPal records for Mr. Gadson's

9    account.

10         In addition, Roza Novikov, every time she was asked to

11   provide a lease agreement, it was a lease between the victim

12   and a landlord who was purportedly Ryan Casey.  Every time,

13   same standard lease agreement between Ryan Casey and then the

14   name of the victim who she was impersonating.  In fact, the

15   defendant when he applied for those -- those loans in

16   Massachusetts in March in New Bedford, he provided the exact

17   same lease agreement between Ryan Casey and Joshua McDermott,

18   who's the individual whose identity he had stolen.  So I would

19   just proffer that as additional information linking the

20   defendant to the scheme that Novikov and Benson participated

21   in.

22         THE COURT:  Do you actually have some type of

23   exhibits to offer in support of the proffer?

24         MS. SAWYER:  I can, Your Honor.  I'm going to offer

25   Exhibit 3, Your Honor.  There's two copies of that.

1          THE COURT:  Okay.

2          MS. SAWYER:  For the record, this is a PayPal

3    account that the defendant opened on Thursday, December 20th,

4    2018.  You'll see his first name and last name on the first

5    page.  If you turn to the second page, you will see the phone

6    number associated with that account is (508) 245-1943.

7    Notably at the top you'll see several e-mail addresses

8    associated with this PayPal account, including the infamous

9    Andrewking033 Gmail account, which is discussed in a lot of

10   the pleadings in this case.

11         I'm going to now offer Exhibit 4.  Exhibit 4, Your

12   Honor, is a member account agreement between Sarah Bills, who

13   is one of the victims in this case whom Roza Novikov was

14   impersonating, and the Freedom Credit Union.  This transaction

15   is on the list of transactions in Paragraph 16 of the revised

16   presentence report.  It's the fifth one down on Page 8,

17   Freedom Credit Union in Massachusetts.  If you look on the

18   very first page of this exhibit you will see she listed her

19   phone number as (508) 245-1943, and if you turn towards the

20   back of Exhibit 4, Your Honor, you will see a residential real

21   estate lease between Ryan Casey and Sarah Bills.  This is a

22   lease agreement that she presented, Roza Novikov presented, at

23   the time she applied for this loan.

24         Exhibit 5, Your Honor.  This is the loan application

25   that the defendant himself submitted to the First Citizens

1    Federal Credit Union in Fairhaven, Massachusetts.  That is the

2    transaction that he admitted and acknowledged and accepted

3    responsibility for in his sentencing memorandum.  And you'll

4    see that he posed as an individual by the name of Joshua

5    McDermott.  And if you turn to the third page of this

6    residential real estate lease, again, you'll see a virtually

7    identical lease agreement between Ryan Casey and Joshua

8    McDermott, which the defendant presented in support of this

9    loan application.  And although the picture is a little

10   blurry, if you turn two pages in you will see that he also

11   presented a driver's license in the name of Joshua McDermott

12   bearing his photograph.

13        And then 5A, Your Honor, the defendant used a platform

14   called paystubcreator.net to generate the bogus pay stubs that

15   he provided to Novikov and others when they applied for loans.

16   Exhibit 5A, Your Honor, is an e-mail that we found in the

17   Andrew King Gmail account when we obtained that with a search

18   warrant.  You will see that Page 1 of 5A is an e-mail, a cover

19   e-mail, from paystubcreator.net to again Andrew King Gmail

20   address.  Conveniently the defendant copied himself on the

21   e-mail; there's -- you see his name there.  And then if you

22   turn the page you will see the Army National Guard Recruiting

23   Office pay stubs that the defendant submitted one day later to

24   the credit unions in Massachusetts when he posed as Joshua

25   McDermott.

1        THE COURT:  And what does -- what is the import of

2    this exhibit?  What is the importance of it?

3        MS. SAWYER:  It is -- I think it confirms Roza

4    Novikov's characterization of his role in the overall scheme,

5    that namely he was the one that created the bogus pay stubs

6    and provided them to her to support fraudulent loan

7    applications.  And here you have an e-mail in his e-mail

8    account essentially creating a pay stub that he then the very

9    next day took to banks in Massachusetts and applied for

10    fraudulent loans.  So it's again consistent with his -- her

11    characterization of his role in the overall conspiracy.

12        THE COURT:  Thank you.  Attorney Rioux, I'm going to

13    take a brief recess.  I will give you a chance to review these

14    with your client further.  So it is now 11:00 o'clock, and I

15    will be back on the bench by 11:10.  We'll be in recess.

16        (A recess was taken from 11:02 a.m. to 11:14 a.m.)

17        THE COURT:  We're back on the record in the matter

18    of United States versus Bernard Gadson.  Attorney Rioux, do

19    you wish to be heard further?

20        MR. RIOUX:  Yes, thank you, Your Honor.  I reviewed

21    the exhibits the Government has offered, and I'll certainly --

22    obviously the matter's not gone to trial here so we're not

23    fully disputing all of these things.  But generally speaking,

24    this does help to establish the conduct that Mr. Gadson pled

25    guilty to.  He certainly did, and the evidence would show,

1    procure information that was used to further bank fraud and

2    engaged in conduct that aided and abetted identity theft and

3    this is evidence of that.  But it does not answer and what it

4    does not prove is whether he was in fact Gio, who is the

5    individual alleged to be the leader of the conspiracy.  Mr.

6    Gadson's accused in the New Bedford matter, which we agree can

7    be relevant conduct here, but it's still a pending case that

8    has not been fully contested in another jurisdiction, so all

9    the facts are not out in that matter.  But there certainly is

10   more to that than what we see here.  However, we concede that

11   that is countable as relevant conduct.  There is an overlap of

12   information that was used throughout some of these

13   transactions.  That's beyond dispute.

14        The question is really whether Mr. Gadson is a leader

15   and whether he's responsible for all of the transactions that

16   the others conducted without him being present and we assert

17   without his involvement.  He's certainly responsible for some

18   of it.  He pled guilty and that's why we're here.  But he

19   shouldn't be held responsible for all of it and he's not the

20   leader.

21        THE COURT:  Thank you.  Based upon the evidence that

22   I've been presented with and I have now considered, I find

23   that there is substantial evidence that provides corroboration

24   of the investigatory reports of the interviews conducted with

25   a co-conspirator in this case, Ms. Novikov, and specifically

1    her identification of the defendant, Mr. Gadson, as being Gio.

2    I'm not going to recount all of the evidence that provides

3    substantial support for that -- her identification of Mr.

4    Gadson as being Gio, but I would note that her

5    characterization of Mr. Gadson's role in the conspiracy of

6    providing the false identities, credit scores, fraudulent loan

7    applications, supporting documents, pay stubs, W-2s, lease

8    agreements, certainly his role in the conspiracy is shown in

9    connection with the three transactions to which he admits

10   direct involvement, and the same documents or similar

11   documents were used in connection with other fraud committed

12   during -- by the conspiracy as a whole in addition to those

13   three.  Further, that with respect to those three and,

14   therefore, with respect to the others it was Mr. Gadson's role

15   to purchase false identities or identities of innocent people

16   which were used for purposes of the fraudulent loan

17   applications.

18        The evidence that I've received does confirm that in

19   fact Mr. Gadson maintain a residence in Dorchester as she

20   suggested.  There's some dispute in how she characterized the

21   residence that's not explained by the evidence, but I don't

22   find that as sufficient to disregard so much other

23   corroborating information.  That includes, among other things,

24   her knowledge of him as having luxury vehicles, her

25   identification of Gio as also going by the initials BG3, BG of

1    course being Mr. Gadson's initials, and the fact that Ms.

2    Novikov positively identified Mr. Gadson in photographs of

3    him.

4        The possible motive to lie suggested -- to protect

5    another individual is simply unsupported.  There's nothing --

6    other than the fact that he was physically present, which is

7    what brought him to the attention of authorities, there's

8    simply no other evidence of his participation in any of these

9    fraudulent events.  And so the coincidence of his first name

10   being Giovanni and Mr. Gadson's nickname being Gio is at least

11   on this record a coincidence.

12       The prosecution statements -- furthermore, the

13   prosecution statement in this case, Mr. Gadson's case, as well

14   as the prosecution statements in the related cases provides

15   further corroboration for statements by -- made by Ms.

16   Novikov, and I just don't see a reason on this record to

17   disbelieve a -- a major portion of her statements to

18   authorities based upon the speculative idea that she is

19   seeking to protect somebody else.

20       So for those reasons the defendant's objections to the

21   revised presentence report that I have not already addressed

22   on this record, and those are the objections that are

23   summarized in ECF 212, are denied.

24       Attorney Sawyer, is there anything that I have not

25   addressed with respect to the objections to the presentence

1    report or the evidence that you feel needs to be addressed?

2         MS. SAWYER:  Only the last remaining issue, which is

3    whether the defendant is still entitled to receive credit for

4    acceptance of responsibility.

5         THE COURT:  I understand that will be part of your

6    sentencing argument.  I'll hear that in just a moment.

7         MS. SAWYER:  Yeah, that's it.

8         THE COURT:  Attorney Rioux, is there anything I have

9    not addressed that needs to be addressed at this stage?

10        MR. RIOUX:  I don't believe so, Your Honor.  There

11   could be other issues that come up, but for now I think we're

12   good.

13        THE COURT:  Thank you.

14     Attorney Sawyer, I'll hear from you now at this time on

15   behalf of the Government on the matter of sentence.

16        MS. SAWYER:  Yes, Your Honor.  First I'd like to

17   address the issue of whether the defendant should receive

18   credit for acceptance of responsibility.  As I noted in our

19   sentencing memorandum, the burden is on the defendant to show

20   that he truthfully admitted the conduct comprised in the

21   offense of conviction and truthfully admitted or did not

22   falsely deny any additional relevant conduct.  And as I noted

23   in the sentencing memorandum, while the defendant is not

24   required affirmatively to admit conduct beyond the offenses of

25   conviction, you may consider whether he mendaciously denied

1    relevant conduct in deciding whether he's acted in a manner

2    that's inconsistent with accepting responsibility.

3        I think, as I pointed out in the memo, the probation

4    office in this case characterized this issue as a close call,

5    and that was before the defendant denied responsibility for

6    the vast majority of his conduct in this case.  And I think

7    that -- I think that conduct has disqualified him from

8    receiving credit for acceptance of responsibility.

9        This defendant has never shown remorse for his conduct

10   or accepted responsibility for the pain and the damage and the

11   harm he caused to so many individuals and financial

12   institutions.  And so I just -- I strongly urge the Court to

13   strip that credit away from him when calculating the final

14   sentencing guidelines.

15       If Your Honor were to do that, the guideline range,

16   taking into account the mandatory two-year consecutive term

17   that must be imposed in this case, is up to 149 months.  I was

18   very clear in my sentencing memorandum that we believe that

19   the defendant should be sentenced at the very high end of the

20   guideline range.  He is, as I argued in my brief, a classic

21   grifter.  He's a con man.  He has supported himself and lived

22   a lavish lifestyle by cheating and stealing, and there's no

23   evidence that he has ever, ever accepted responsibility for

24   that conduct.  It is his way of life.  And it makes him a

25   danger to the community, just as Judge Rich found when he

 1   revoked his bail in this case.

 2        The defendant has a lengthy criminal history.  He's

 3   served time in prison before.  It's not dissuaded him one iota

 4   from engaging in this type of conduct.  He may have traded a

 5   gun for a computer and a credit card, but he is still just as

 6   dangerous as he's ever been.  And I think it's important to

 7   send a message, Your Honor, that this conduct is serious and

 8   it needs to be punished harshly to deter other people he's

 9   associated with and other people out there who may be tempted

10   to steal people's personal identification and run a scheme

11   where you basically grift using runners to go in and steal

12   money from financial institutions using the identities of

13   helpless victims who don't even know their identities have

14   been stolen.  That message needs to get out there.

15        And I put this in the memo and I think this bears

16   reiterating.  He has spread his conduct around in different

17   jurisdictions, in different towns, in different financial

18   institutions.  He rolls into town, burns it down, and moves on

19   to the next one.  And there are a lot of local police

20   departments in Massachusetts and in Maine who simply never

21   could put it all together because he moved too quickly and he

22   hid his tracks.  But the rubber finally met the road in Maine

23   when a detective with the Kittery Police Department called

24   Special Agent David Pawson at Homeland Security and said, I

25   think we may have something big here, and he did.  And now

1    he's been caught and we respectfully urge the Court to

2    sentence him to the highest possible sentence in this case.

3    Thank you.

4         THE COURT:  Attorney Sawyer, in the companion case

5    against Mr. Benson Judge Hornby imposed sentences which

6    resulted in a total sentence of 57 months.  And what do you

7    say about the need to avoid unwarranted sentencing disparities

8    consideration as it relates to my sentencing of Mr. Gadson?

9         MS. SAWYER:  Well, in that case, Your Honor, the

10   defendant's guideline range was lower because he got -- he got

11   a variance for pleading during COVID.  He got the benefit of a

12   COVID plea agreement, which reduced that range further.  Mr.

13   Benson did not engage in criminal conduct while he was on

14   pretrial release, as this defendant did.  This defendant

15   racked up almost $80,000 in fresh harm in damages while he was

16   subject to supervision by this court.  I think that alone

17   distinguishes his case from Mr. Benson's case.

18        Mr. Benson also, if you -- if you had a chance to read

19   the presentence report, did not have cash and cars and jewelry

20   and watches and all the stuff that this defendant has.

21   Clearly he was profiting and using other people as shields to

22   keep himself from getting caught red-handed.  I think that

23   completely distinguishes Mr. Benson from Mr. Gadson.

24        THE COURT:  Am I correct in understanding that, as

25   set out in the presentence report, Ms. Novikov -- and perhaps

1    it's in the exhibit, not in the presentence report, but I'd

2    like to hear you comment on this -- Ms. Novikov reported to

3    the authorities that Mr. Gadson was receiving 60 percent of

4    the proceeds from these fraudulent transactions and Mr. Benson

5    was receiving 40 percent from which he was then paying her?

6    Is that --

7            MS. SAWYER:  That's correct, Your Honor.  That was

8    in the information that she provided to law enforcement.  And

9    that is another reason, as probation noted, for the role --

10   the role enhancement.  It makes him more culpable; he profited

11   more from the activity.  And so that's another important

12   consideration, Your Honor.

13           THE COURT:  Thank you.

14       Attorney Rioux, I'll hear from you on behalf of Mr.

15   Gadson.

16           MR. RIOUX:  Thank you, Your Honor.  Your Honor, it's

17   not clear to me, have we resolved the issue of the Minnesota

18   allegations that were part of my objection?

19           THE COURT:  What is -- well, I asked you whether

20   there were any other matters we needed to address.

21           MR. RIOUX:  Well, I thought we were wrapping up just

22   with regard to the -- the Giovanni or the Gio leadership

23   issue.  I -- my apologies.  There is the -- the issue of the

24   conduct alleged to what happened involving a separate alleged

25   conspiracy in Minnesota detailed in Paragraphs 19 --

1    Paragraph 19, basically, of the presentence report.

2        THE COURT:  And what specifically is your argument

3    with respect to Paragraph 19?

4        MR. RIOUX:  Well, Your Honor, the allegation here is

5    that there was -- there's an uncharged set of allegations out

6    of Minnesota, which are alleged to have involved other

7    individuals and a claim that Mr. Gadson was involved in those

8    transactions.  We don't have full discovery on this or

9    anything of that nature, but I believe, my understanding,

10   these intended loss amounts have been added to the conspiracy

11   involving the allegations of Novikov and Benson.  And with

12   those additions it would put it into the next category with

13   regard to loss amount for a 12-point enhancement rather than a

14   10.  And we dispute and still dispute that those allegations

15   are not part of the relevant conduct for the offense of

16   conviction here.  It's totally different geography, different

17   time frame, different individuals involved.

18       THE COURT:  It would be relevant because it was

19   alleged fraudulent conduct conducted while he was on bail for

20   this matter.  So are you challenging whether it's relevant, or

21   are you challenging whether there's evidentiary support for

22   those allegations?

23       MR. RIOUX:  Well, I guess I just want to make sure

24   we clearly had a ruling on that issue.

25       THE COURT:  I want to make sure I understand your

1    argument.  Are you suggesting it's not relevant, if in fact

2    there's factual support for it?

3            MR. RIOUX:  Yes, Your Honor, it's my contention that

4    it would be conduct unrelated to the offense of conviction and

5    so it's not relevant conduct as to the sentence.

6            THE COURT:  And why would it be unrelated to the

7    offense of conviction if someone's on bail and they commit

8    similar frauds?  How could that not be related conduct?

9                (Defendant conferred with counsel.)

10           MR. RIOUX:  Your Honor, they are mere accusations;

11   they're not even -- they don't even rise to the level of

12   accusations yet.  There are no charges; there have been no

13   arrests, no indictments related to this.  This is information

14   we were provided with in -- basically in an affidavit from

15   Agent Pawson at the time of bail revocation.  It's not

16   anything that we pled to or admitted to as part of the --

17           THE COURT:  So you're saying it's not proven.

18           MR. RIOUX:  Yes.

19           THE COURT:  My question to you is you argued it's

20   not relevant.  If it's proven is it relevant?

21           MR. RIOUX:  I suppose so.

22           THE COURT:  Attorney Sawyer, do you have any

23   evidence to support Paragraph 19?

24           MS. SAWYER:  I do, Your Honor.  I do.  I would just

25   note that, again, the Court is entitled to rely on the

1    information set out in the presentence investigation report

2    unless the defendant controverts it, and in this case he

3    really has not offered any evidence to controvert it.  But I

4    am prepared to offer the Court evidence linking him to the

5    commission of those crimes.  I agree, I had understood his

6    objection to be that, even if he was involved, it wasn't

7    relevant conduct as a legal proposition.  I now understand him

8    to be saying that there's no evidence linking him to the

9    frauds in Minnesota.  I'm prepared to present evidence.

10             THE COURT:  And what form does that evidence take?

11             MS. SAWYER:  Documents.  Documents.

12             THE COURT:  And how long will your presentation on

13   that point require?

14             MS. SAWYER:  I think I should be able to do it in

15   about 15 minutes.

16             THE COURT:  Fifteen minutes, okay.  One moment,

17   please.

18                 (The Court conferred with the clerk.)

19             THE COURT:  Attorney Sawyer, please proceed.

20             MR. RIOUX:  Your Honor, one moment.  I've consulted

21   with Mr. Gadson further.  He doesn't want to contest the

22   factual basis for the Minnesota conduct, so we're happy to

23   move forward.

24             THE COURT:  So as I understand it the objection to

25   Paragraph 19 is withdrawn; is that correct?

```
 1              MR. RIOUX:  Yes, thank you.

 2              THE COURT:  All right.  That being the case, I

 3    believe we're at the point, Attorney Rioux, where I'll hear

 4    from you on the matter of sentence.

 5              (Defendant conferred with counsel.)

 6              MR. RIOUX:  Thank you, Your Honor.  With regard to

 7    the acceptance of responsibility, Your Honor, Mr. Gadson

 8    obviously did plead guilty, he admitted to the prosecution

 9    version of the offense.  There is in our estimation a pretty

10    complicated set of transactions and events related to what

11    happened here and in our view a valid dispute as to what Mr.

12    Gadson's role was in those transactions.

13              We've attempted to carve out a plea and an agreement

14    that takes responsibility but frankly allowed him room to

15    contest the issues that he contested, that he did not plead

16    guilty to as part of the counts of conviction and that he had

17    asserted or not supported on the record.  If the matter had

18    gone to trial, obviously, things would have played out in a

19    different way.  That's not what we've done here.

20              Still, we respect the Court's determination and

21    understand the rulings the Courts have made, but I think there

22    was a -- a legitimate, good-faith contest as to the

23    applicability of certain issues here.  The Court having found

24    against us is understandable, but it doesn't mean that he has

25    failed to accept responsibility by contesting issues that make
```

1   a potentially significant difference with regard to his

2   sentence.

3           Turning to how the Court should resolve the matter, we

4   are also concerned about the question of whether there would

5   be substantial disparity in sentences here.  Mr. Benson

6   received a sentence of 57 months.  Ms. Novikov I believe

7   resolved her matter with a sentence of 27 months or

8   thereabouts.  It's quite clear that Mr. Benson and Ms. Novikov

9   were involved in directly and personally a large number of

10  transactions and really all of these transactions that Mr.

11  Gadson's alleged to be Gio in connection with.  And so I would

12  suggest that a sentence along the lines of what the Government

13  has requested would create a significant and unwarranted

14  disparity for sentencing purposes.

15          Mr. Gadson is a man who stands before the Court accused,

16  convicted of serious crimes for, but he still has substantial

17  support from friends and family, many of whom have joined us

18  in the courtroom, and I'll name them for the Court so the

19  Court can know who's here to speak on his behalf or -- not to

20  speak on his behalf but at least provide support.

21          Mr. Byron Williams is here, if you could stand up.  He's

22  a friend of Mr. Gadson's since childhood.  He's traveled from

23  out of state to be here.  Michelle Stennett is a friend of

24  many years, she's traveled here.  Brittany Parson, actually

25  Mr. Gadson's ex-girlfriend but still a close friend, is here.

1    She's known him for over 10 years.  Kevin Fulton, a friend
2    since childhood, is here to provide support as well and has
3    traveled from out of state to attend the proceedings.  Robert
4    Pitt, a friend since teenage years, has traveled a long
5    distance to provide support to Mr. Gadson.  Shamekia Harvey is
6    here as well, Mr. Gadson's sister, and has traveled from out
7    of state to attend the proceedings.  Asia Benson is here as
8    well to provide support, Mr. Gadson's sister.  Star Johnson is
9    here as well, a friend of Mr. Gadson's, traveling from out of
10   state to attend the proceedings.  And Lauren Alvarado, a
11   friend of Mr. Gadson's of many years, has also come here.
12       Mr. Gadson obviously has made -- has made serious
13   mistakes and has violated the law, and he stands here ready to
14   accept sentence for having done that.  But what we're asking
15   the Court to consider is a sentence that would be
16   substantially less than what the Government is proposing, a
17   sentence that would give him a chance at a future within the
18   relatively near future, to give him a horizon to be out and to
19   be a parent to his two young children, ages eight and two, to
20   be successful in business and work.
21       He has worked in legitimate business, in fact, was
22   co-owner of a nightclub and had started to become successful
23   before his recent incarceration.  He has the ability to do
24   productive work in the future and to be a contributing member
25   of society.

1          In part of my exhibits, Your Honor, I provided the Court

2     with some documentation from the jail education program,

3     Exhibit 5.  While incarcerated -- actually Exhibit -- pardon

4     me, I think I may have numbered them -- but Exhibit 6, I

5     believe, Your Honor, provides a transcript of educational

6     programs that Mr. Gadson has participated in during the course

7     of his incarceration.  Now, these are through an education

8     program that is voluntary they make available to individuals

9     at Strafford County.  As you can see, he's completed some 86

10    hours of educational programming, including parenting courses,

11    general sort of prosocial programming, some vocation-related

12    work as well.

13         He is also working as part of the jail industries

14    program, and there's a letter of support, I believe I stamped

15    it as Exhibit 5, from Michael Garcia, who is an employee of

16    the Strafford County Department of Corrections and writes on

17    Mr. Gadson's behalf.  He has been involved in jail industries

18    as -- throughout his stay at Strafford County.  He is I think

19    the only individual entrusted with the screen printing program

20    there and has developed some expertise in that field.

21         While incarcerated, as this Court's aware right now,

22    conditions are challenging.  He was infected with COVID in

23    January of this year and became quite -- quite sick.  He

24    recovered and has done all right over the last month or so.

25    His pod has been under lockdown because of a new COVID

1    outbreak.  He's been able to steer clear of that.  But

2    in-person visits at the facility have of course been

3    suspended.  In fact, outside physical mail is no longer

4    available.  They photocopy and provide photocopies of mail,

5    but he's been unable to receive color photographs -- oh, he's

6    only getting legal mail, and even that is a photocopy

7    facsimile of the mail.  There's a GTL tablet communication

8    system, but that has been out recently and has worked only

9    intermittently, and so his contact with family and other

10   sources of support have been limited.

11        The programming he's been able to do is through the

12   video-based education system, but the in-person educational

13   programs, treatment, vocational programs that one might hope

14   to be able to accomplish while incarcerated have been largely

15   unavailable, in fact, entirely unavailable for his stay.  It's

16   hard to know what the timeline will be on these continued

17   restrictions, but it does make incarceration now substantially

18   more burdensome and more challenging than it might have been

19   even a short time ago.  We would ask the Court to consider

20   that in imposing a sentence.  But I would still submit that

21   Mr. Gadson's participation in industries, in programming and

22   educational opportunities demonstrates that he has a good

23   chance or a good opportunity for rehabilitation once he is

24   released.

25        Your Honor, it's also worth noting, we talked about it a

 1    little bit, it's in the presentence report, the video variance

 2    issue.  Mr. Gadson has consented to video proceedings

 3    throughout the pendency of this case and we did the guilty

 4    plea by video, we've conducted all other hearings remotely.

 5    This matter was scheduled for in-person proceedings because we

 6    had anticipated that live witnesses may be called, but if we

 7    had known they would not be called we certainly would have

 8    consented to proceed by video in these proceedings.  So I

 9    would ask the Court to consider a variant sentence based on

10    Mr. Gadson's willingness to participate in court by video and

11    his actual participation in all other court proceedings by

12    video up to this point.

13        Mr. Gadson did come up under challenging circumstances,

14    Your Honor.  And his mother, and I can attest personally to

15    this, suffers from some severe mental illness.  I have spoken

16    to her on a number of occasions.  She is quite ill at the

17    moment, and I -- as of last check was institutionalized.  She

18    is -- she's suffered from those conditions for many years and

19    that impacted her ability, I would suggest, to be an

20    effective -- an effective parent during much of Mr. Gadson's

21    childhood.

22        He has had some success in his life and I would say

23    seemed to move past some of those struggles.  In the early

24    part of the 2000s he worked for some years with Roca, which is

25    an agency that works with folks who are the victims of trauma

1  or violence or difficult childhood circumstances.  He was

2  featured in a video for that organization as one of the youth

3  leaders there.  And he -- he really accomplished a lot with

4  that agency and still maintains relationships with folks in

5  that agency to this day.  He hopes upon release that he may be

6  able to recommence his work there or take advantage of

7  services that they may offer.  But, you know, it's a shame

8  that he's found himself here because, despite the challenges

9  he faced in his youth, he -- he has been effective in many

10 ways in rising above that and finding success.

11     What we would ask the Court to consider doing is to

12 impose a sentence that is more commensurate with what Mr.

13 Benson received as part of his -- as part of his case

14 resolution.  Our proposal is for something in the range of 39

15 months of incarceration followed by five years of supervised

16 release.  Obviously that would be a significant variance off

17 of what the guidelines might suggest, but under these strange

18 circumstances and these difficult times I suggest that it

19 would be appropriate.

20     He may face -- he still does face other proceedings in

21 New Bedford which are unresolved and which he hopes

22 potentially to resolve after this case is done, and that will

23 be sort of the next phase.  But to impose a sentence of

24 something north of 10 or 12 years, in looking at other

25 comparable cases I couldn't find anything that netted a

1    sentence in that -- in that range that's readily available in

2    this district.  In researching other fraud cases, bank fraud

3    cases, that I could find recent U.S. Attorney press releases

4    on, I came across a case in Massachusetts involving $3 million

5    in bank fraud that netted sentences in the range of 30 or 40

6    months, people who had perhaps less criminal history, but

7    commonly bank fraud matters do not in my experience net

8    sentences of that level.

9        I would suggest that a sentence in the range of 140 plus

10   months here is unwarranted, is substantially disparate from

11   the other similarly situated co-conspirators, co-defendants.

12   My suggestion is for a sentence that is something more

13   commensurate with what Mr. Benson received.

14       I think that in fact we could impose substantially more

15   supervised release potentially, I think up to 10 years would

16   be possible here, and supervised release may be exactly what

17   would be the best way to address Mr. Gadson's circumstances.

18   Probation can be an effective supervisor; they can help him

19   with educational and vocational opportunities.  The probation

20   officers in his area are known to be quite diligent and can

21   work effectively with him.

22       He's got substantial support from friends and family.

23   He's got the smarts and the work ethic to do well on release.

24   We just ask that we not delay his release by something in the

25   range of 10 years.  He still has young children and he hopes

1    to be a part of their childhood and a part of their future.

2    And that's why we're making the request I'm making.

3                THE COURT:  Attorney Rioux.

4                MR. RIOUX:  Yes.

5                THE COURT:  With respect to unwarranted sentencing

6    disparities, as I consider that argument in this case,

7    specifically in connection with Mr. Benson, there's a number

8    of -- it seems to me there's a number of facts that perhaps

9    distinguish Mr. Benson and Mr. Gadson, but the most notable is

10   that Mr. Gadson has pled and now been found guilty of criminal

11   contempt, of essentially continuing the criminal conduct while

12   on bail.  Why should I not regard that as substantial

13   justification for a disparate sentence?

14               MR. RIOUX:  Your Honor, I agree that it could

15   justify a different treatment here.  He pled guilty and

16   admitted to the contempt allegation based on his travel

17   without permission, and he on several occasions conceded that

18   he did travel without permission, always returning to the

19   jurisdiction, never missing check-ins with probation, but that

20   he did violate that restriction.

21        I concede, Your Honor, that that is a difference between

22   the two and could be the basis for treating Mr. Gadson

23   differently.  But to effectively nearly -- more than double

24   the sentence that Mr. Benson got I think is still an

25   unwarranted disparity, even though there may be some reason to

```
 1    warrant some disparate treatment.

 2              THE COURT:  Thank you.

 3         Mr. Gadson, if you'll stand, please.  As a defendant who

 4    is before the Court about to be sentenced you have a

 5    constitutional right to speak to me at this time, but it's

 6    only if you wish to speak.  You're not required to speak.  Do

 7    you wish to speak?

 8              THE DEFENDANT:  Yes, I do, Your Honor.

 9              THE COURT:  Please go ahead.  Why don't you pull the

10    microphone a little bit closer to you, and I'm actually going

11    to ask you to keep your mask on, please.  And like I said,

12    pull the microphone over, thank you.  All right, Mr. Gadson,

13    please go ahead.

14              THE DEFENDANT:  First and foremost, I'd like to

15    thank Your Honor and the Court for allowing me to present

16    myself.  I'd like to take the time to say I apologize for my

17    part in the activity that took place in Kittery, Maine, at Key

18    Bank in early 2019.  I take full responsibilities for my all

19    actions, including my travel to Miami and San Juan, Puerto

20    Rico --

21              THE COURT:  One moment, Mr. Gadson.  The court

22    reporter needs you to talk slower so that we can make sure we

23    get all of your words properly down.  So take your time,

24    please.

25              THE DEFENDANT:  I take full responsibility for all
```

1    of my actions, including my travel to Miami and San Juan,

2    Puerto Rico, without permission of the supervising probation

3    officer at the time, Taylor Waltz.  My actions were completely

4    unexcusable and unacceptable.

5        Since my incarceration I have tooken steps to be a

6    better person, make better decisions, and partake in all

7    rehabilitation programs available at the facility.  I'm

8    currently a supervising trustee at the Prison Industry

9    Enhancement Certification Program.  My day-to-day

10   responsibilities require me to clean, sort, and provide all

11   clothing and linens to the hospice patients at the county

12   nursing homes and hospitals five days a week.  I'm also the

13   only inmate that currently runs the commercial screen

14   program --

15        THE COURT:  Remember to slow down, please.

16        THE DEFENDANT:  For the hospice patients at the

17   county nursing homes and hospitals five days a week.  I'm also

18   the only inmate that currently runs the commercial screen

19   printing program for Strafford County, which requires me to

20   put together current and new officers' uniforms, print names

21   and badges on their clothing, and distribute the uniforms upon

22   order, including all the other surrounding counties in New

23   Hampshire.

24        Because of the current COVID pandemic outside counselors

25   are not allowed in the building to put -- to stop the spread

1    of infection.  I took my days off of the week to become an

2    educational tutor with the jail inmate-led Edovo

3    rehabilitation program.  I have helped myself and other

4    inmates complete a large number of classes.  I completed over

5    340 courses, earning myself 43 certificates of completion to

6    prepare myself for the future and a return home.

7        On a more personal note, I'm a father.  I have two

8    children ages eight and two, only one and seven at the time of

9    my incarceration.  I haven't been able to see them in over a

10   year.  I would like to try to make it home to them as soon as

11   possible so I can be part of their lives.  I am a business

12   owner of a private social club that's been open since 2020.  I

13   have great support with the community.  That's all.

14           THE COURT:  Thank you, sir.  And, Attorney Rioux,

15   anything further on behalf of your client?

16           MR. RIOUX:  No, thank you, Your Honor.

17           THE COURT:  The sentencing issues presented to me

18   this morning are relatively complicated, and so I think it's

19   important that we and I take the time needed to make sure that

20   all the arguments have been carefully considered.  For that

21   reason I'm going to recess, and during that recess I'll be

22   working on and reviewing again all the exhibits and the

23   arguments before I decide what is a fair and just sentence in

24   this case.  We are going to be in recess until 12:45 p.m.

25   Nick, does that work?  We are going to be in recess until

```
 1   12:45 p.m.  I will see you all back in the courtroom at that

 2   time.

 3            (A recess was taken from 11:58 a.m. to 12:58 p.m.)

 4            THE COURT:  I want the record to be clear that the

 5   Court is receiving as part of the evidentiary record of this

 6   sentencing all of the exhibits that the parties have marked

 7   and presented to me, which I have carefully considered.  I

 8   have also carefully considered the memoranda of law that the

 9   attorneys submitted beforehand, and I have also carefully

10   considered the revised presentence investigation report,

11   except to the extent that I have expressly not adopted or

12   modified provisions of the report during the first half of

13   this or the first part of this proceeding or in comments I'm

14   about to make.  Except to that express extent, I am adopting

15   all of the report in its entirety as my findings in support of

16   the sentence that I'm about to impose.

17            One item that needs to be addressed before I turn to the

18   sentencing arguments and the guidelines is there was an

19   objection I believe also raised by the defendant to whether

20   the -- assuming that he was found to be a manager/supervisor

21   of criminal activity, which I do find, whether it involved

22   five or more persons.  And I want to specifically state on the

23   record that I do find that indeed it did involve five or more

24   persons.  Specifically they included Mr. Gadson, Mr. Benson,

25   Ms. Novikov, Ms. Chicha, and L.R.
```

1         I want to now turn to the question of acceptance of

2    responsibility under the guidelines.  I've already found that

3    the defendant's position and evidence with respect to his role

4    was -- is unpersuasive and I've rejected that position.  And

5    then there's an additional question of whether his challenging

6    the findings in the report associated with his role is

7    frivolous and so lacking in merit as to disqualify him from

8    acceptance of responsibility credit in this case, mindful of

9    the fact that he has pled guilty to all the charges -- not all

10   the charges but to those that he and the Government have

11   agreed he would plead to with the Government agreeing to

12   dismiss other matters.

13        So the question, then, is whether he's -- I should view

14   him as by having challenged his role as also then

15   disqualifying him from acceptance of responsibility it seems

16   to me centers on the fact that what he disputed was his role

17   in the conspiracy, shifting blame to his co-conspirators,

18   characterizing himself as a minor player relative to them, and

19   suggesting that they hold primary responsibility for the

20   crimes and that indeed Ms. Novikov has lied about him and his

21   role to benefit someone else.

22        Now, the presentence investigation report reflected

23   that, because of the criminal conduct in Minnesota, whether

24   acceptance of responsibility should be given to Mr. Gadson in

25   this case is necessarily a close call.  And so I'm considering

1    the -- in trying to weigh his challenging fundamental points

2    about the criminal conduct that's at issue here as -- as

3    sufficiently serious as to disqualify him from acceptance of

4    responsibility.

5        With that background, I conclude that it does disqualify

6    him, that he -- in other words, that the record before me

7    persuades me that he hasn't truthfully accepted responsibility

8    here.  He hasn't truthfully admitted the conduct that can

9    provide -- that comprise the offense of conviction.  There's

10   substantial ample evidence that he was the top person in this

11   criminal activity, and he has not accepted that.  And so I

12   cannot in good faith conclude that he has sufficiently taken

13   responsibility for his actions so as to receive a reduction.

14   So for that reason I am not going to grant the three-level

15   reduction.

16       In light of that, the following modifications have to be

17   made to the sentencing guideline calculations in the report.

18   Paragraphs 38 and 39 of the revised presentence report are

19   deleted.  Total offense level in Paragraph 40 becomes 27.

20   Paragraph 84 is revised to reflect the total offense level of

21   27.  For Count 3 of Docket No. 19-CR-122 and Count 1 of Docket

22   No. 21-CR-163, a total offense level of 27 and a criminal

23   history category of IV, that results in a sentencing guideline

24   range of 100 to 125 months.  For Docket No. 19-CR-122, Count

25   4, the guideline sentencing range is the minimum term of

1    imprisonment required by statute of 24 months, and the

2    aggregate sentencing range is 124 to 149 months.

3         I want to, however, make clear that, although I conclude

4    that he's not entitled to credit for acceptance of

5    responsibility under the guidelines, I do feel that he is

6    entitled to some variant sentence in acknowledgment of the

7    fact that he's pleaded guilty and certainly to that degree has

8    largely accepted responsibility in that respect, and by doing

9    so he has saved the Government from trial in this case, and

10   furthermore his stated willingness to proceed by video, it

11   seems to me that those form the basis for a variant sentence

12   in this case, and they will be reflected in my final

13   sentencing determination.

14        Now, before I move on to discuss some more

15   considerations regarding the sentence in this case, I want to

16   know whether, counsel, you have any question or other comment

17   with respect to the summary I've provided regarding the

18   guidelines in view of the rulings I've made regarding

19   acceptance of responsibility.  Attorney Sawyer?

20        MS. SAWYER:  No, I think they're correctly

21   calculated, Your Honor.

22        THE COURT:  Thank you.  Attorney Rioux?

23        MR. RIOUX:  Nothing further, thank you.

24        THE COURT:  All right.  The nature and circumstances

25   of the offending conduct in this case has been I think well

1    discussed already in connection with the arguments we've had

2    up to this point in time.  The revised presentence report

3    reflects that Mr. Gadson helped to organize and led a

4    conspiracy to engage in fraudulent schemes to borrow money

5    using stolen IDs.  This required the production of bogus

6    documents, including bogus leases, pay stubs, residential

7    lease agreements, as I said, in the names of victims, all

8    which was used to support fraudulent loan applications.  This

9    went on for in excess of a year.  It involved extensive travel

10   and coordination of efforts between Mr. Gadson, Mr. Benson,

11   and Ms. Novikov.  It's notable that Mr. Gadson was receiving

12   the majority of the proceeds of these frauds and Ms. Benson --

13   Mr. Benson and Ms. Novikov received less, far less.

14        This type of financial fraudulent criminal conduct is --

15   can have devastating effects for its victims, that is,

16   numerous people's credit potentially is ruined, at least for a

17   time.  Of course, the institutions lending the money don't see

18   repayment.  And it's -- the seriousness of the criminal

19   conduct here is underscored by the fact that it was an ongoing

20   scheme, not simply one or two isolated incidents.  There's

21   true social harm associated with this type of fraud, and the

22   sentencing ranges that Mr. Gadson faces reflect that it is

23   conduct which deserves a serious sentence.

24        Mr. Gadson himself is now age 31.  He had a difficult

25   childhood, no doubt.  He's a father of two children now ages

1    eight and two.  He has -- does not have a significant

2    established history of gainful employment but at least in

3    recent years became involved with a social club as an owner.

4        His criminal history reflects that he has been involved

5    in encounters with law enforcement pretty much throughout his

6    adult life.  I should say it started actually as a teenager.

7    And he has a number of charged conduct for which he has not

8    been convicted, which was either previously dismissed or is

9    pending, some of which is, not all of which, but some of which

10   is consistent with a same pattern of criminal behavior that's

11   charged here, that is, fraudulent behavior, criminal use of

12   IDs, identity theft, things of that sort.  And so it would

13   appear that -- yes.

14            PROBATION OFFICER:  May I approach, Your Honor?

15            THE COURT:  You may.

16       (The Court conferred with the probation officer.)

17            THE COURT:  Let me be clearer than I have been.  I

18   am not going to consider any charged conduct for which there

19   are no convictions in my determination of sentence in this

20   case, and so I am effectively striking my comments with

21   respect to charged conduct that is pending for which there are

22   no convictions.  It simply won't be considered in my

23   calculation or my determination of sentence in this case.

24        Rather, let me state that his criminal history up to --

25   leading up to this offense, the offenses for which he is

1    charged here, reflects that he has trouble and has had trouble

2    conforming to the requirements of the law during his life.

3        Now, I mentioned that Mr. Gadson has two children, eight

4    and two.  The revised presentence report reflects that he has

5    been involved as a parent, has been supportive of them.

6    That's all to his credit.  And I also think that what's

7    promising with respect to the defendant and should be factored

8    in the sentence is that he has demonstrated during the period

9    that he's been incarcerated a serious effort to try and

10   advance himself in a prosocial way.  He has completed one of

11   the longer lists of educational programs I've received in

12   connection with a sentencing.  He's had positions of trust in

13   the institution.  And this all bodes well at least for Mr.

14   Gadson having the potential to rehabilitate himself and come

15   out of a period of incarceration and hopefully live a

16   positive, lawful life.

17       Furthermore, in consideration -- in considering sentence

18   in this case there's a few other factors that I think are

19   important.  As has been pointed out by Mr. Rioux, Mr. Gadson

20   has been confined during the pandemic.  The conditions of

21   pretrial incarceration are harsher than usual, with very

22   limited -- less -- I should say more limited social

23   opportunities and opportunities for contact with others.  I

24   mentioned earlier that I'm taking into consideration in

25   arriving at a variant sentence his willingness to proceed by

1    video and the fact that he did accept responsibility in the

2    sense of pleading guilty in this matter.

3         What is also significant is for me to consider

4    disparities and unwarranted disparities in sentencing and in

5    particular in this case the sentence that was previously

6    imposed on Mr. Benson.  I've already discussed the fact that

7    in connection with the criminal conduct associated with this

8    conspiracy that's before me today, the defendant was the

9    leader.  He made the most profit and was I think -- can fairly

10   be characterized as the mind or the mastermind of the effort

11   that it took to put together the fraudulent scheme by

12   acquiring fraudulent documents and equipping others to be in a

13   position to walk into a financial institution and fraudulently

14   take out loans.

15        So as between him and Mr. Benson, I think that a

16   disparity in sentence is appropriate for that reason.  But

17   more than that is the fact that Mr. Gadson is before me today

18   having pled guilty also now to criminal contempt for his

19   conduct in Minnesota, having been released on bail for this

20   type of fraudulent conduct and then repeating it, which is

21   extremely troubling, extraordinarily brazen, and suggests a

22   complete disregard for the requirements of law.  After all,

23   Mr. Gadson had been released on bail.  He had made assurances

24   that he would comply with the requirements of bail.  And so

25   Mr. Gadson and Mr. Benson's situations are really quite

1    different.

2         Furthermore, in Mr. Gadson's case we have, in addition

3    to the events in Minnesota, significant violations of

4    requirements of bail associated with his out-of-state travel,

5    and that included extensive airline travel to Miami, Los

6    Angeles, Las Vegas, Puerto Rico, and the like, without

7    permission of his supervising officer.  And that also reflects

8    poorly on the seriousness with which the defendant takes these

9    matters and views himself as responsible to follow the rules

10   that apply to everyone else.

11        The law requires me to consider what is the purpose of

12   the sentence that's being imposed here and there's a number of

13   possibilities.  There's a few that stand out in this case.

14        The first is to reflect the seriousness of the conduct.

15   I've already spoken to that here.  This was a serious offense;

16   it went on for some time.

17        Secondly, to provide adequate deterrence and

18   specifically in this case to provide adequate deterrence to

19   the defendant, Mr. Gadson.  He was not deterred by the

20   indictment in this case and by a bail order.  And so I have to

21   be -- I have to be concerned regarding his willingness and

22   ability to comply with the law, not return to criminal

23   behavior, and the sentence should reflect that and it should

24   provide a sufficient message to him that if he continues to

25   think that he can get away with things like this and he's

1    apprehended and he appears before a judge, he'll be facing

2    very harsh consequences.  And so in that respect also the

3    sentence should protect the public from further crimes by the

4    defendant.

5         Now, counsel, before I conclude my analysis, is there

6    any aspect of your arguments that I have not addressed that

7    you believe needs to be addressed, Attorney Sawyer?

8              MS. SAWYER:  I don't believe so, Your Honor, thank

9    you.

10             THE COURT:  Attorney Rioux?

11             MR. RIOUX:  No, there is not, thank you.

12             THE COURT:  Mr. Gadson, I ask that you stand at this

13   time.  Because there are multiple counts in this case and

14   because of the requirements of the laws that are involved,

15   there's several different components that make up the ultimate

16   sentence in this case and so I have to explain them.

17        First, on Count 3 of Docket No. 19-CR-122 and Count 1 of

18   Docket No. 21-CR-163, I am proposing a variant sentence

19   concurrent on both counts of 80 months imprisonment.

20        With respect to Title 18 of the United States Code

21   Section 3147, I am imposing an additional consecutive sentence

22   of six months.  So that's six months to be served

23   consecutively to the sentence I've imposed on Count 3 of

24   19-CR-122 and consecutively to Count 1 of 21-CR-163.

25        On Count 4 of Docket No. 19-CR-122, I'm imposing a

1    24-month sentence that is consecutive to Count 3 of 19-CR-122

2    and consecutive to Count 1 of 21-CR-163 and consecutive to the

3    six months pursuant to Title 18 U.S.C. Section 3147.  The

4    resulting aggregate term of imprisonment in this case is 110

5    months.

6         In addition, I'm imposing a period of supervised release

7    as follows:  On Count 3 of 19-CR-122 and Count 1 of 21-CR-163

8    concurrent terms of supervised release of four years, and on

9    Count 4 of 19-CR-122 a term of supervised release of one year

10   also to be served concurrent with the others.  So in effect,

11   then, or in the end supervised release for a period of four

12   years.

13        I am not imposing a fine.  I conclude at this point in

14   time that Mr. Gadson doesn't have the means with which to pay

15   a fine and therefore I'm not ordering one.  I am, however,

16   ordering restitution as is required.  The total restitution in

17   this case is $256,537.  Mr. Gadson receives a credit for

18   $13,196, leaving a balance of $243 ,341.  Finally, I'm

19   imposing a special assessment in this case of $100 on each

20   count, there are three counts, so that's a total of $300.

21        I want the record to reflect that I have carefully

22   considered each of the defendant's objections under the

23   guidelines and to the revised presentence report.  With

24   respect to the guidelines, the record should reflect that,

25   even if I had accepted an objection that I have not, under the

1    Title 18 sentencing factors the sentence would be the same,

2    even without consideration of guidelines, because that's a

3    sentence that I conclude is under all the facts and

4    circumstances fair and just.

5        Attorney Sawyer, at this point are there any counts that

6    need to be ordered dismissed?

7        MS. SAWYER:  Yes, Your Honor.  At this time the

8    Government would move to dismiss Counts 1, 2, and 5 of

9    Criminal Case No. 19-122.

10       THE COURT:  That motion is granted and they are

11   ordered dismissed.  And before I advise the defendant of his

12   rights of appeal, first, Attorney Sawyer, is there any aspect

13   of the sentence I have not addressed that needs to be

14   addressed?

15       MS. SAWYER:  Not that I can think of, Your Honor.

16       THE COURT:  Attorney Rioux?

17       MR. RIOUX:  No aspect that is unaddressed, thank

18   you.

19       THE COURT:  Thank you.

20       MR. RIOUX:  I would ask, Your Honor, if it's time

21   now, for designation to a facility in the northeast region as

22   practically close as possible to his family in Boston.

23       THE COURT:  I will make that recommendation to the

24   Bureau of Prisons, that is, that he be incarcerated in the

25   northeast and as close to the city of Boston as possible so

1    that he will be in close proximity to his family and his

2    children, which I find will advance his rehabilitation.

3           Mr. Gadson, in this case in your plea agreement you

4    waived your right to appeal from your guilty plea and any

5    other aspect of your conviction and from a sentence of

6    imprisonment that does not exceed 60 months.  And so you do

7    have the right to appeal from the sentence that I've just

8    imposed.  To exercise that right, you're obligated to file a

9    written notice of appeal with the clerk's office within 14

10   days.  Do you understand?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  If you fail to do that you'll have

13   waived your right, given it up, to appeal.  Do you understand?

14          THE DEFENDANT:  Yes.

15          THE COURT:  If you can't afford to appeal, you can

16   make a written request expressing that to the clerk, again

17   within 14 days, and you'll be permitted to appeal without

18   paying any required fee.  Do you understand?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  All right.  Mr. Gadson, in the end, I

21   think I've said enough at this point regarding the seriousness

22   of your criminal conduct and why I believe it deserves the

23   sentence that I've imposed.  But I do want to make an

24   observation, and that is the criminal conduct that you engaged

25   in required a fair amount of cunning, in other words, an

1    understanding of financial transactions, a degree of

2    sophistication that suggests to me that you are intelligent

3    and capable and have promise.  Of course, the question is

4    whether you're going to direct your energies into something

5    which is positive and prosocial and lawful or not.  But I

6    would be remiss if I didn't comment that I see you as someone

7    with great promise.

8         You're still relatively young.  You've got two

9    relatively young children.  You'll serve this time and you'll

10   come out.  And the real issue of course is, well, what are you

11   going to do with yourself when you do come out, what are you

12   going to make of yourself.  You've obviously got a community

13   of people that care about you.  You've got a lot to live for.

14        And so I would like to I guess leave you with the idea

15   that for justice to actually be served in this case in the

16   end, to be completely served, it -- it requires that you now

17   do something good with your life and not something bad, that

18   you do something which not only makes the people that care

19   about you proud of you but also makes your children proud of

20   you.  They are going to be adults someday, and they are going

21   to have to make sense of what happened with their dad.  How

22   did he get into that trouble?  What came of it?  And of course

23   that story is not complete.  In some ways it's just beginning.

24   You have the potential to truly inspire your kids by your

25   example and the community.  And I would like to suggest to you

1    that if you can look back on this experience, let's say 10, 20

2    years down the road and be able to say, yes, I did turn myself

3    around, I did good things with my life, I didn't take

4    advantage of other people, and your kids are able to have that

5    same message from your experience, then there'll be real

6    justice here.

7        That's what I hope for you.  I see that potential in

8    you.  I hope you see that potential as well.  I hope that

9    you'll use the time that you're incarcerated, as you have to

10   some degree already, to advance yourself, to equip yourself to

11   live a life -- a life of meaning, a life of purpose, a life

12   that's good.  That's my hope for you.

13       Attorney Sawyer, is there anything else we haven't

14   addressed that needs to be addressed today?

15           MS. SAWYER:  Yes, Your Honor, the conditions of

16   supervised release.

17           THE COURT:  Thank you.

18           MS. SAWYER:  The mandatory, standard, and then the

19   special conditions we would recommend that the Court impose.

20           THE COURT:  Thank you very much.  Yes, I need to

21   address those.

22       Attorney Rioux, have you reviewed with Mr. Gadson all of

23   the special, mandatory, and standard conditions of supervised

24   release set forth in the revised presentence report?

25           MR. RIOUX:  Yes, Your Honor.

```
 1              THE COURT:  Are you satisfied he understands them?

 2              MR. RIOUX:  I am.

 3              THE COURT:  Mr. Gadson, you've reviewed all the

 4    conditions with your attorney?

 5              THE DEFENDANT:  Yes, I have.

 6              THE COURT:  And you feel that you understand them?

 7              THE DEFENDANT:  I do.

 8              THE COURT:  Is there any objection to any of them?

 9              THE DEFENDANT:  No, thank you.

10              THE COURT:  All right.  I am ordering all of the

11    conditions that were set forth in the report.  Officer

12    Belanger?

13              PROBATION OFFICER:  Yes, Your Honor, did you also

14    want to -- I understand that you made your order on the

15    restitution, but after Paragraphs 56 on Page 34 of the PSR did

16    you want to order the restitution consistent with that as it

17    applies to each individual victim, the priority, and the joint

18    and several with Novikov and Benson?

19              THE COURT:  Which paragraph is this?

20              PROBATION OFFICER:  96, it starts on Page 34 and it

21    goes to Page 36.

22              THE COURT:  The restitution as I've announced it in

23    this case will be in keeping with the delineation of

24    restitution in Paragraph 96 of the revised presentence

25    investigation report Pages 34 to 36.
```

1   Finally, Attorney Sawyer, anything else?

2     MS. SAWYER:  Not from the Government, Your Honor.

3     THE COURT:  All right.  Attorney Rioux, anything

4 else?

5     MR. RIOUX:  No, thank you.

6     THE COURT:  All right.  I want to thank the

7 attorneys for all of their efforts today, Probation Officer

8 Belanger as well for her work in this matter.  It was a fairly

9 complex matter.  I think it's important -- I think it's always

10 very important to recognize that when someone is sentenced

11 this is a very important event in Mr. Gadson's life, and so I

12 want to acknowledge those of you who have traveled here to be

13 here to support him, that that was a very important thing to

14 do.  Mr. Gadson, good luck to you.

15     THE DEFENDANT:  Thank you.

16     THE COURT:  Court is now adjourned.

17     (Time noted:  1:32 p.m.)

18

19

20

21

22

23

24

25

1

2                    **C E R T I F I C A T I O N**

3    I, Lori D. Dunbar, Registered Merit Reporter, Certified

4    Realtime Reporter, and Official Court Reporter for the United

5    States District Court, District of Maine, certify that the

6    foregoing is a correct transcript from the record of

7    proceedings in the above-entitled matter.

8    Dated:  August 24, 2022

9                    /s/ Lori D. Dunbar

10                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25